Case number 18-2381 Alfred Wingate Jr v. USA Argument not to exceed 15 minutes per side. Mr. Kim, you may proceed for the appellant. Thank you. Good morning, your honors, and may it please the court, Andrew Kim for the appellant, Alfred Wingate Jr. And with the court's permission, I'd like to reserve three minutes for rebuttal. Very well. Thank you, your honor. Mr. Wingate is serving a sentence of 57 years for a series of robberies for which the purported mastermind and ringleader is serving only 11 years despite being tried in the same trial on the same evidence but with obviously different results. Mr. Wingate is serving 57 years because his trial counsel rendered ineffective assistance, specifically with respect to the MediCap pharmacy robbery and his failure to seek the suppression of unreliable identification made by an independent eyewitness as a result of an ineffective assistance. And it also erred by concluding that the underlying pharmacy robbery was a crime of violence under Section 924C. And for these two reasons, we ask that the district court's order denying Mr. Wingate's Section 2255 motion be reversed. An identification made as a result of a process that creates a substantial likelihood of misidentification violates due process. And the resulting identification must be suppressed if the identification is not otherwise reliable. Here, the only identification made by an independent eyewitness that placed Mr. Wingate at the scene of the crime was made by Heather Cabot, a pharmacy employee who only looked at the unmasked robber for a brief period of time, who could not provide the police with a description of the robber at the time she was giving her initial statement, and who provided her initial identification of Mr. Wingate based on a lineup in which he was singled out for having the physical characteristics of a full beard and looking like Rick Ross, the rapper. And this is how the undue suggestiveness arose. At the time Ms. Cabot gave her initial statement to the police, she didn't provide any information as to what the briefly unmasked robber had looked like. But we do know that Ms. Gelo, a fellow pharmacy worker with whom Ms. Cabot had a close friendship, did provide an initial statement to the police that said the robber was tall and that he looked like Rick Ross. And we know that when the police approached Ms. Cabot at her workplace 11 days later to conduct a photo lineup identification, the only person in the room, or the only person in the lineup rather, who matched that description of Rick Ross and having a full beard was Mr. Wingate. And that was an unduly suggestive lineup. And there was a characteristic that made Mr. Wingate stand up, in that particular lineup, which was the beard. And this isn't like Legginsoff or Washington, where you're dealing with gradations. In Legginsoff, you had a white-haired individual juxtaposed against a series of varying shades of gray. Or Washington, where you're trying to tell whether the skin tone is lighter or darker. We're not dealing with shades here, your honors. This is a full beard that stands out. And the only person who has the distinctive beard was him. And on this point, I'd like to refer the court to something that was said by Mr. Chadwell, who was counsel for the government, who tried the case, who argued the direct appeal, and who handled the 2255 proceedings. In the direct appeal of this case, back in 2015, the ineffective assistance claims were presented for the first time, and the court ultimately decided that in accordance with its usual practice, it should be deferred to 2255 proceedings. And in that oral argument for that direct appeal, Mr. Chadwell said, and I quote, you might even say, this is about 26 minutes into the oral argument, he said, you might even say Wingate's was colored in by marker. It looks so bad. And it looks like Wingate is darker than he is. He also says, it wasn't a good photo spread, obviously. So if you're looking at the lineup itself, without even considering the circumstances that led to the lineup, you can tell that it's suggestive. And this is like the black coat that you have in Rahim, for which the lineup focuses on the one distinct memorable thing about the person, which is the fashionable black coat that the witnesses have seen. And moreover, if you compare this to a case like Washington or Watson, which is referred to in Washington, you don't have any record that suggests that the police had taken measures to ensure that the lineup wasn't unduly suggestive. In Washington, you had an officer who took care to make sure that the facial hair on each of the lineup members were comparable and that there was a similar glare so that nothing in particular stood out. You don't have those measures here. And Ms. Cabot's identification of Mr. Wingate was unduly suggestive, the result of an unduly suggestive lineup. And it otherwise was not reliable. The government's reliability argument depends almost entirely on, and this was the district court's conclusion as well, an exchange that Ms. Cabot had on direct, in which she said, and when she was asked, did you get a good look at this, at the suspect? And she simply says that she did. But if you look at her- Counsel did, at the time prior to the photo lineup, had Ms. Cabot said, well, I didn't get a good look at him, but he did have a full beard? No, Judge Botts. Ms. Cabot did not provide the police with any description of the  suspect. Am I right that the beard issue comes by way of the Ms. Gelo saying he looks like Rick Ross? If you know your rappers, you know Ross has a full beard, because otherwise the lineup would seem to be what you might want. One has a full beard, two have closely shaved beards, and three are unshaven. If you didn't have an ex-ante description, wouldn't you want a spread of facial hair? Well, there's enough in the record, Your Honor, to suggest that Ms. Cabot may have talked to Ms. Gelo. That point hasn't been definitively established. Mayhem, is that what you said? There's no evidence that she did talk to this other person? The testimony, so Ms. Cabot, or Ms. Gelo was asked rather, or rather Ms. Cabot was asked, she didn't recall with any sort of specificity she said she may have. Okay, so we're speculating that she did, or, I mean, you don't have any evidence to support your theory, it doesn't look like. Well, but even removing, we submit, Your Honor, that the lineup is suggesting, even if you don't account for a statement given to the police. As Judge Botts pointed out, you've got a whole range of facial hair, and, I mean, it looks like a total scope of what facial hair would be. Why is it suggested? It is a spectrum of facial hair, Judge Griffin, but- That's the word. Mr. Wingate is the only suspect who had a distinct, it stood out, and as the government's direct appeal argument, it looked like it was filled in. So the fact that it stands out in and of itself, separate and apart from anything that Ms. Gelo or Ms. Cabot might have known, separate and apart from that, the fact that Mr. Wingate's beard so prominently stands out, and I think everyone would agree that it's very hard to tell from this particular lineup, this is the quality of the photographs as reprinted in the record is not terrific, but Mr. Wingate's beard does stand out as compared to all the other individuals. Counsel, what's your best case for the proposition that a beard that looks like this, that sort of stands out, if you will, makes a lineup unduly suggestive? Nothing with beards, Judge Larson. The closest case that I think we can cite is Halim, where you have the bandage suspect, something that stands out. There's no, obviously, no connotation of injury or connotation of misconduct. Say, for example, if you have a suspect in a jumpsuit, for example, you don't have that with a full beard, obviously, but we submit that the case law doesn't require that. And what the case law requires is that you have something that might have an individual hone in on one particular suspect in the lineup, which is that full beard. And, you know, accounting for the fact that, you know, Ms. Cabot did say, oh, I got a good look at him, you know, this identification wasn't otherwise reliable. She, the district court said this moment was freighted with importance because she saw the gate closing. And, you know, but if you look at what she says on the stand, she said that she had turned around, the gates were coming down, and while the gates were closing, the unmasked robber was putting on his mask. And if you consider her ability to view the robber, she was on the floor, and we know from Ms. Gilo's testimony that any time that they tried to look at the robbers, they were told to avert their eyes or avert their gaze. This isn't like cases in which this court has found reliability. This isn't like Halim, for example, where you had an eyewitness that had prior familiarity with the defendant or the suspect picked out in the lineup and, you know, watched his mother getting stabbed 30 times. That's a long period of time for such a traumatic incident. This isn't like Peterson, where you had an eyewitness who looked at bank photos that allowed her to recollection of what, and rather, it allowed her to gain a recollection of what she saw at the bank, and she remembered that she had a long time to look at the shooter. Or in Crozier, where you had no mask. So, adding the fact that she hit Ms. Cabot couldn't remember what the robber looked like at the time she gave her initial statement, or at least didn't recall providing that information to the police, suggests that her identification was otherwise unreliable. And I'd like to turn quickly to the 924C argument with my remaining time. On that point, the from the 9th Circuit, addressing cases in the 9th Circuit and the 11th Circuit, I'd like to point out, Your Honors, that in neither of those cases, the parties raised what we argue here, which is that you look to how the offense has been treated and whether, in the words of the Gouge Court, United States v. Gouge, where this court held that Hobbs Act robbery was a crime of violence for 924C purposes, you look to whether there's reasonable probability that the offense can be committed in a non-violent way. We submit that in those other cases, in the 9th Circuit and the 11th Circuit, those courts didn't address what we think is a reasonable probability, or at least a demonstration of a reasonable probability here. We have a cousin offense, so to speak, to 2118A, in which under a West Virginia statute that forbade robbery caused by fear of bodily injury. We see a pharmacy robbery that took place in which no threats were made or no threatening gestures were made. We submit that that's one example in which, you know, it's not a 2118A case, but it is close enough to show that there was a reasonable probability that this crime, this pharmacy robbery under 2118A, can be committed in a non-violent way. Mr. Kim, I have a more fundamental, really a gateway question as to our authority to rule on the statutory issue you've raised. Congress in 1986, as part of the EPA Habeas Act, which restricted habeas cases, amended the statute to provide that a certificate of has made a substantial showing of the denial of a constitutional right. That is a new restriction that Congress imposed in 1996, which to me does not give us authority to review statutory claims, denial of statutory claims, which is what you've asserted here. Now, I recognize the government has not raised this issue, but I think our authority to rule on such a case is imperative. And although a certificate of appealability was granted here, we have the authority to say it was improvidently granted. It should not have been granted because the law, the EPA law, doesn't authorize this. And I know you haven't, you know, this isn't in your briefs, but I think our court always looks at our authority to act. And to me, it appears we don't have authority to adjudicate your statutory claims. And if you've got any opinion on it at this point, I'd like to hear about it. Your Honor, at this time, you know, as your Honor pointed out, this issue was not argued by the government. With the court's permission, if we can address it on supplemental briefs, I think from both sides within 10 days on it, because I think it's a fundamental gateway issue. And I don't think I would be on part of an opinion which adjudicates an issue that Congress has refused to give us authority to adjudicate. So if you could look at it, it's my understanding that this was the restrictions on COAs was made by Congress. And this was intentional to reduce our authority on habeas cases. And if you think that there's some sort of an exception or the statute doesn't read what it says, I'd like to hear about it. Yes, your Honor. Well, I'd like 10 minutes to find our 1010 days to file supplemental briefs on that. Thank you, your Honor. All right. Anything? Any further questions at this time? Judge? Okay, let's hear from the government. Good morning. I can't hear you, though. You're muted. I'm mute. Still mute. Okay, my name is Patricia Gaedeke. I represent the United States. You can tell this is my first video, aren't you? Sorry. With respect to the identification issue, Judge Parnell ruled on this as if he had entertained a pre-trial motion to suppress. He said that if there had been a pre-trial motion, he would have determined that the photo spread was not unduly suggestive, and that even if it had been unduly suggestive, he would have found that the identification by miscabot of Wingate in court was reliable. That is the standard under the Supreme Court cases and this Court's cases, whether the identification made in court is reliable under the totality of the circumstances. I have not heard anything that suggests that Judge Parnell's finding was incorrect. This issue of whether there was a similarity to Rick Ross, the rapper, is something that the supposedly ineffective Mr. Richards injected into the case. Ms. Gilo testified on direct and on the first cross-examination without ever mentioning anything about Rick Ross. She did not identify Mr. Wingate. On recross, Mr. Richards asked her whether she had said at the time she was interviewed, just after the robbery, that one of the robbers resembled Rick Ross, the rapper, and she didn't remember at first, but when he showed her her statement, she said, yes, yes, I did say that. No other questions were asked of her as to whether she had mentioned it to anyone else. When Ms. Cabot testified, she said that she had picked out Wingate from this photo spread and it had taken her less than a minute to choose him. Now, I didn't go back and listen to the oral argument from the direct appeal, but I can or not good photo spread because the picture of Mr. Wingate looks elongated somehow, so and the reproduction of it in the briefs for sure makes it a little hard to see the pictures in the lineup, but I don't think he meant to concede that there was anything suggestive about the lineup. As the court has already observed, there's a range of types of and difficult for the police to find a mugshot with a full beard like Wingate had, but we don't know because no one questioned the officer who put together the photo lineup as to how he went about putting it together, but when the witness who identified him in the photo lineup testified, she said that she got a good look at Mr. Wingate in the store because her attention was drawn to him when the metal covering over the pharmacy came down and she looked to the place where the button was that could make that happen because the metal covering didn't usually come down unless they were closing the store and it wasn't closing time. Judge Charnow said he thought that meant she was really paying attention to what was going on and that she had an adequate opportunity to work. That's a credibility judgment that he made that you need a good reason to overturn on appeal. The only discussion about Rick Ross with Ms. Cabot was that she was asked whether Ms. Gila, whether she had discussed with Ms. Gila her identification or anything else and she had said Ms. Gila didn't come back to work after the robbery, so I didn't talk to her very often and Mr. Richards pressed her. Well, you said you were best friends. Are you telling me you didn't talk to her every day? You didn't talk about things? And she said, well, we talked every day or mostly every day when we worked together, but she didn't come back. So she denied that they had a conversation about this to the extent that she had any recollection. So there's really no basis in the record for finding that she was influenced in her identification by any statement of Gila's that the man looked like. How about Gila? Was Gila asked whether she talked to Cabot about it? No, she wasn't. Okay, so there's really an absence of proof. I mean all I have is my guess. Exactly. Gila was never asked. The only other time Rick Ross came up was when Richards asked a cooperating witness, Sherita Kennedy, who was I think Crow's girlfriend, whether she knew Wingate and she said she did and he asked her if she thought he looked like Rick Ross or no he asked her if she thought there was anyone who looked like Rick Ross and she said no. So it was just kind of a theme that ran through that didn't accomplish much. But in the end what you have under Strickland is that a requirement that the defendant must show both ineffective performance or substandard performance and prejudice and it's not possible for him to show prejudice when the district court would have ruled on this pretrial motion they wish had been made says I would not have granted it. I would have allowed the in-court identification because I find that under the totality of the circumstances her opportunity to observe was sufficient and her identification was. Now as to the 924c issue I think that probably that's adequately covered by the argument that this court should treat it in exactly the same way that it's treated bank robbery and the McBride decision. Other courts have also treated it the same way they've treated bank robbery as well as carjacking. I might add that the pharmacy robbery statute was added in 1984, a number of years after bank robbery. So when Congress said by force of violence or by intimidation it was legislating against a background of using that term intimidation as a descriptor for a crime of violence. Counsel do you have a position on you may not at this point although the United States sees a lot more of these 2255 motions than I would think Mr. Kim does. So does the government have a position on Judge Griffin's question about whether the certificate of appealability was properly granted in this case where the second claim is a statutory claim? We see a lot of these and I have to say my thought was what a great question. I never thought of that. The statute does say that it has to be certified as a constitutional question. This is not a constitutional question so off the top of my head I have to think that the judges identified a real problem but I have not researched that. It did not occur to me when I was preparing this case so I wouldn't want to say anything definitive other than that the government has not raised it. Is the government prepared to file a supplemental brief on the issue within 10 days? Certainly we'd be glad to your honor. Because I for one am reluctant to rule on a matter that I don't think I have authority to rule on. Congress has prohibited us from ruling on cases that assert only statutory claims and whether it's jurisdictional or not doesn't matter to me. If I'm without authority from Congress I'm reluctant to do it. Okay so I'll look forward to that supplemental brief. Thank you. We'll be glad to submit that. Unless the court has questions on the other issues that were raised we're content to rest on the briefs. I have none and on Judge Boggs do you have any further questions? No I'm fine. I'm fine. Judge Larson? No. Okay all right. I think we have three minutes of rebuttal Mr. Kim. Thank you your honor. Just three quick points your honor. First the government suggests that this would have been there was no prejudice because Judge Tarnow would have denied the motion anyway. You know one that wasn't Judge Tarnow's prejudice conclusion he said there was enough evidence against Mr. Wingate without you know without the testimony of Ms. Cabot that would have resulted in his conviction. But that was the testimony of his co-conspirators who also testified against Mr. Crow as to the MediCap Pharmacy robbery and he was acquitted. So we submit that the verdict would have been different. And moreover the you know whether Judge Tarnow would have granted the motion is not definitive on the prejudice question because had a motion been properly filed it could have been preserved for further appellate review by this court. And second on the the conversations between Ms. Gelo and Ms. Cabot again we submit that the lineup in and of itself was unduly suggestive just the way it was composed. But I'd like to clarify one factual point in response to government counsel's statement that they did not talk. The record is not clear on that point if you look at page ID 1345 Ms. Cabot testifies I don't remember directly if we did or did not because she I didn't really communicate with her too quickly afterwards and when asked what about within 11 days she says it's possible. So as Judge Griffin pointed out this isn't proving the you know there's no proof at this point there's an absence of evidence but we submit that there's enough to suggest that if the court finds that a conversation between Ms. Gelo and Ms. Cabot is relevant to suggesting this that it's there. And with that if the court has no further questions or comments. Any further questions Judge Boggs? No. All right thank you. Thank you counsel the case will be submitted. It's my understanding that concludes our oral argument docket this morning. With that you may adjourn the court. The court is now adjourned.